An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-48

NORTH CAROLINA COURT OF APPEALS

Filed: 5 August 2014

IN THE MATTER OF:

D.M.W.                                        Forsyth County
                                              No. 13 J 94


Appeal by mother and father from order entered 9 October 2013 by Judge Denise S. Hartsfield in Forsyth County District Court. Heard in the Court of Appeals 22 July 2014.

*Assistant County Attorney Theresa A. Boucher for Forsyth County Department of Social Services, appellee.*

*Womble Carlyle Sandridge & Rice, LLP, by Murray C. Greason, III for Guardian ad litem.*

*Batch, Poore & Williams, PC, by Sydney Batch for appellant-mother.*

*David A. Perez for appellant-father.*


STEELMAN, Judge.


Where the trial court's unchallenged findings of fact and findings supported by evidence in the record form a sufficient basis for its conclusions of law, the trial court did not err. Where the trial court properly found that a minor child was

neglected, it did not abuse its discretion in refusing to return the child to father's home.

## I. Factual and Procedural Background

On 21 May 2013, the Forsyth County Department of Social Services ("DSS") filed a juvenile petition alleging D.M.W. was a neglected juvenile in that she lived in an environment injurious to her welfare. Specifically, the petition alleged that D.M.W., a newborn, would reside in the home where her brother D.N. lived and was "seriously physically abused in April 2012 by other than accidental means." The matter came on for hearing on 26 August 2013. By order entered 9 October 2013, the trial court adjudicated D.M.W. a neglected juvenile. The trial court granted legal custody of D.M.W. to DSS and sanctioned the placement of D.M.W. with her maternal grandmother and step-grandfather.

Mother and father appeal.

## II. Standard of Review

"The role of this Court in reviewing a trial court's adjudication of neglect [] is to determine '(1) whether the findings of fact are supported by 'clear and convincing evidence,' and (2) whether the legal conclusions are supported by the findings of fact[.]'" *In re T.H.T.*, 185 N.C. App. 337,

343, 648 S.E.2d 519, 523 (2007) (quoting *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000)), *aff'd as modified*, 362 N.C. 446, 665 S.E.2d 54 (2008). "If such evidence exists, the findings of the trial court are binding on appeal, even if the evidence would support a finding to the contrary." *Id.*

### III. Findings of Fact

### A. Father's Arguments

In his first argument on appeal, father contends that the trial court erred in making certain findings of fact. We disagree.

The trial court made the following pertinent findings of fact:

> 10. On or about May 20, 2013, the Forsyth County Department of Social Services received a report alleging [D.M.W.], age 3 days to be a neglected juvenile as she lives in a home where another child has been subjected to physical abuse.
>
> 11. [D.M.W.] is the newborn infant child of [mother] and [father]. This child will reside in the home where her brother, [D.N.] lived and was seriously physically abused in April 2012 by other than accidental means. [D.N.] was examined by Dr. Meggan Goodpasture on April 30, 2012 at NC Baptist Hospital and diagnosed with:
>
> - Two large subdural hematomas of mixed intensity believed to have occurred at

different times. The subdural hematoma on the left was more dense and believed to be more recent likely one week in age and the subdural hematoma on the right side of the child's skull was less dense and believed to be likely weeks in age.

- Acute bleeding along the right occipital lobe; which was likely a subdural hematoma or potentially a rebleed secondary to a very large subdural hematoma or more consistent with repeat trauma.

- Bilateral retinal hemorrhages that were determined to be intraretinal.

- Five definite healing rib fractures (Left anterior healing rib fractures of the 5th, 6th, 7th, 8th $^{ribs}$ and Left posterior healing rib fracture of the 11th rib)[.]

12. Based upon the constellation of injuries, [D.N.] was diagnosed with abusive head trauma/child physical abuse. The injuries received by [D.N.] were of different ages and stages of healing.

13. The primary caregivers of [D.N.] were his mother, [mother] and her boyfriend, now husband, [father]. [Mother] worked outside of the home and [father] was [D.N.'s] primary caretaker while his mother worked. At the time of [D.N.'s] hospitalization, [mother] reported that the child's only caretakers in addition to she and [father] were the maternal grandmother, [M.N.], who had watched the baby the weekend before his hospitalization, and her brother's girlfriend, [S.R.] (whose last name she did not know at the time) who had cared for the baby in March 2012. [M.N.] was a retired

pediatric nurse who first noticed [D.N.'s] head growing larger and insisted that the mother take the child to the doctor.

. . . .

22. [D.M.W.] is an infant child as was [D.N.] when he was seriously physically abused in the home.

. . . .

41. [Mother] reports that she suspects [S.R.] may have caused the injuries to [D.N.]. [Mother] reports that [S.R.] babysat with [D.N.] on two occasions which she definitively report [sic] were February 2, 2012 and March 2, 2012. Dr. Goodpasture has indicated that [D.N.'s] subdural hematomas are difficult to date [and] could be as recent as one to two weeks old or up to two months old. In her expert opinion, there could have been multiple head traumas suffered by [D.N.]. Retinal hemorrhages although also difficult to date generally resolve within one month. In Dr. Goodpasture's expert opinion, rib fractures are easier to date. The rib fractures of [D.N.] upon presentation to the hospital on April 26, 2012 were 2 to 4 weeks old. The rib fractures suffered by [D.N.] could not have occurred while he was in the care of [S.R.] on February 2, 2012 or March 2, 2012. To this day no one has come forward to accept the responsibility for the injuries that were caused to [D.N.] but it has been determined that [mother] and [her] husband were the primary caretakers. The Court is concerned for the safety of any child in the home as no one has accepted responsibility for the injuries that were caused to [D.N.] when he was three months old. [S.R.] could not have caused all of the injuries to the child.

As an initial matter, we note that mother and father challenge many of the trial court's findings of fact as not being supported by competent evidence. However, we do not address all of the challenged findings of fact. *See In re T.M.*, 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006) ("[W]e agree that some of [the challenged findings] are not supported by evidence in the record. When, however, ample other findings of fact support an adjudication of neglect, erroneous findings unnecessary to the determination do not constitute reversible error.").

Although father challenges findings of fact 10, 11, 12, and 22, mother does not. Findings of fact 13 and 41 are not challenged by either mother or father and are deemed supported by competent evidence. *See Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991).

Father contends that finding of fact 10 "seems to be a finding for which there is no basis in competent evidence." We do not agree. Dr. Goodpasture testified that she was an attending and supervising physician in the newborn nursery at the time D.M.W. was born. The physician who provided care for D.M.W. was on Dr. Goodpasture's team. Based upon her knowledge of D.N., Dr. Goodpasture recommended that the physician make a

child protective services report to DSS, and that report was made. Dr. Goodpasture testified that she had "significant concern for [D.M.W.'s] safety" if she were placed in the same environment where D.N. resided.

Father next challenges finding of fact 11. Father contends that "since [S.R.] and the maternal grandmother had access to [D.N.] during the time period in which he may have suffered these severe injuries, it was erroneous for the trial court to find [D.M.W.] would reside in the same home in which [D.N.] lived when abused[.]" Father contends "there is no competent evidence to suggest that the potential perpetrators, [S.R.] or the maternal grandmother, resided in [mother and father's] home." Father also challenges finding of fact 22 on the same grounds. Father contends there is no competent evidence to show that D.N. was seriously physically abused in mother and father's home as S.R. or the maternal grandmother may have been the perpetrators of the abuse.

Father's contentions are feckless.

The trial court found that mother and father were D.N.'s primary caretakers and that S.R. could not have caused all of the injuries to D.N. These findings are not challenged by mother or father on appeal. Moreover, mother and father both

testified that they did not believe the maternal grandmother hurt D.N. Mother and father intended to take D.M.W. home to live with them upon her discharge from the hospital. Thus, D.M.W. would have resided in the same home in which D.N. had lived. The trial court did not err in making these findings.

Father also challenges the subparagraphs of finding of fact 11. He contends that Dr. Goodpasture's testimony does not support the specificity of the injuries sustained by D.N. as set forth in the order. We agree that some of the language used in the subparagraphs was not identical to that used by Dr. Goodpasture in her testimony. However, we disagree that her testimony does not support the specific injuries set forth in the finding. Dr. Goodpasture testified in great detail about D.N.'s injuries. Dr. Goodpasture testified that D.N. was diagnosed with five rib fractures. The fractures were on the left fifth, sixth, seventh, eighth, and eleventh ribs. She further testified that D.N. had large subdural hemorrhages on both sides of the brain that required surgical intervention, and retinal hemorrhages in both eyes.

Father further contends that finding of fact 12 is not supported by competent evidence. Again, we disagree. Dr. Goodpasture testified that "[i]n the absence of any accidental

mechanism to explain the[] injuries in a three month old with serious and severe bilateral subdural hemorrhages, bilateral retinal hemorrhages and five rib fractures, . . . the injuries were consistent with child physical abuse." Dr. Goodpasture also gave detailed testimony about the possible ages and stage of healing of the various injuries to D.N.

These arguments are without merit.

## B. Mother's Arguments

Mother contends that the trial court failed to make sufficient findings of fact to support its conclusion that D.M.W. was a neglected juvenile. Mother contends that the trial court "cut and pasted the allegations in the juvenile petition and statements from the DSS court summary into its adjudicatory order[,]" and failed to make independent findings of fact from the evidence presented at the hearing. Mother further contends that since the trial court failed to make independent findings of fact, "this Court cannot determine whether the trial court performed its duty to determine whether the allegations were proven by clear, cogent and convincing evidence." We disagree.

Although the language in some of the findings does correspond to the allegations in the juvenile petition, we conclude that findings of fact 10, 11, 12, 13, 22, and 41 are

supported by competent evidence.  Moreover, these findings of fact are sufficiently specific to allow this Court to review the trial court's decision to adjudicate D.M.W. neglected.

This argument is without merit.

### IV. Neglected Juvenile

Finally, with regard to the adjudication of neglect, mother and father each contend that the trial court erred in finding and concluding that D.M.W. was neglected where the court relied solely on the past abuse of D.N.  We disagree.

The Juvenile Code defines a neglected juvenile as:

> A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law. *In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.*

N.C. Gen. Stat. § 7B-101(15) (2013) (emphasis added).

"We are aware that while the abuse of a child in the home is clearly relevant in determining whether another child is

neglected, the statute 'does not *require* the removal of all other children from the home once a child has . . . been subjected to . . . severe physical abuse.'" *In re McLean*, 135 N.C. App. 387, 395, 521 S.E.2d 121, 126 (1999) (quoting *In re Nicholson*, 114 N.C. App. 91, 94, 440 S.E.2d 852, 854 (1994)). "[T]he statute 'affords the trial judge some discretion in determining the weight to be given such evidence,' and allows the trial court some discretion in determining whether children are at risk for a particular kind of harm given their age and the environment in which they reside." *Id*.

In the present case, the trial court found that D.M.W. would reside in the home where D.N. had lived and was physically abused; that D.M.W. was an infant just as D.N. was at the time he was injured; that mother and father were the primary caretakers of D.N.; that no one had accepted responsibility for D.N.'s injuries; and that the court was concerned for the safety of any child in the home since no one had accepted responsibility for D.N.'s injuries. These findings demonstrate that the trial court weighed and assessed the evidence, and concluded that D.M.W. would be at risk if allowed to reside with mother and father. We hold that the findings of fact support the conclusion that D.M.W. was neglected.

This argument is without merit.

Mother and father next challenge the dispositional portion of the trial court's order. They contend that the trial court erred in conducting a dispositional hearing in which no testimony was taken and where the trial court based its findings of fact on court reports and statements made by counsel. Mother and father contend the trial court delegated its duty as the finder of fact by incorporating the reports as its findings of fact. These arguments are without merit.

> The dispositional hearing following an abuse, neglect, or dependency adjudication may be informal and the court may consider written reports or other evidence concerning the needs of the juvenile. In dispositional hearings, trial courts may properly consider all written reports and materials submitted in connection with said proceedings. Thus, at a dispositional hearing, [a] trial court may consider written reports and make findings based on these reports so long as it does not broadly incorporate these written reports from outside sources as its findings of fact.

*In re J.N.S.*, 207 N.C. App. 670, 679, 704 S.E.2d 511, 517 (2010) (citations and quotation marks omitted). "Evidence heard or introduced throughout the adjudicatory stage, as well as any additional evidence, may be considered by the court during the dispositional stage." *In re Blackburn*, 142 N.C. App. 607, 613, 543 S.E.2d 906, 910 (2001).

In this case, the trial court considered the written reports, incorporated the written reports, and made findings based upon the reports. The trial court also made other findings based on the evidence presented during the adjudication stage. The trial court did not broadly incorporate the facts in the reports as its only findings of fact, nor did it use the reports as a substitute for its own independent review. Therefore, the trial court did not err in conducting the disposition hearing and entering the disposition order.

Mother also contends that the trial court ignored its oral ruling as evidenced by the written order. Specifically, mother contends that the judge said she was not going to make drug testing mandatory; however, in the written order, mother and father are ordered to submit to drug screens, and if they do not submit then the missed drug screen would be considered a positive test. We disagree with mother's contention since our review indicates that the trial court's written order does not differ in substance from its oral rendering in open court. *See In re Brim*, 139 N.C. App. 733, 739, 535 S.E.2d 367, 370 (2000) (finding the trial court did not err where the written order later entered did not differ in substance from the order announced in open court).

Mother further contends the trial court's directive that mother and father be more forthcoming with the court as to how D.N. was abused is inappropriate and should not be permissible. Again, we disagree. In this case, the trial court was concerned about D.M.W.'s safety based upon the injuries D.N. sustained and the lack of an explanation as to how D.N. was injured. Accordingly, we conclude it was not inappropriate for the trial court to seek further explanation about this matter.

Lastly, father contends the trial court abused its discretion at disposition in granting continuing legal custody of D.M.W. to DSS and not placing her back in father's home. We disagree.

"The district court has broad discretion to fashion a disposition from the prescribed alternatives in N.C. Gen. Stat. § 7B-903(a), based upon the best interests of the child." *In re B.W.*, 190 N.C. App. 328, 336, 665 S.E.2d 462, 467 (2008) (citation omitted). "We review a dispositional order only for abuse of discretion." *Id.* "A trial court may be reversed for abuse of discretion only upon a showing that its actions are 'manifestly unsupported by reason.'" *Davis v. Davis*, 360 N.C. 518, 523, 631 S.E.2d 114, 118 (2006) (quoting *Clark v. Clark*, 301 N.C. 123, 129, 271 S.E.2d 58, 63 (1980)).

Here, the trial court was authorized to place D.M.W. in the custody of DSS and not return her to father. *See* N.C. Gen. Stat. § 7B-903(a)(2)(b) (2013). Given the evidence before the court, we discern no abuse of discretion in the trial court's decision not to return D.M.W. to father.

AFFIRMED.

Judges McGEE and ERVIN concur.

Report per Rule 30(e).